**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Frederick R. Watkins, Jr.,                           :           Case No. 1:13CV2160

      Plaintiff,                                      :

vs.                                                        :

Commissioner of Social Security Administration,   :        **REPORT AND
                                                                  RECOMMENDATION**

      Defendant.                                    :

Plaintiff seeks judicial review of a final decision of the Commissioner denying his application for

Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U. S. C. § 401-433.

Pending are briefs on the merits filed by both parties and Plaintiff's Reply (Docket Nos. 15, 17 and 18).  For

the reasons set forth below, the Magistrate recommends that this Court affirm the Commissioner's decision

denying benefits.

## I. PROCEDURAL BACKGROUND

On May 18, 2010, Plaintiff applied for DIB, alleging disability beginning March 31, 2008 (Docket

No. 12, pp. 182 of 508).  Plaintiff's claim was denied on July 26, 2011, and upon reconsideration on October

31, 2011 (Docket No. 12, pp. 118-121; 128-130 of 508). Plaintiff filed a written request for a hearing on

November 11, 2011 (Docket No. 12, pp. 134 of 508).  On May 30, 2012, Administrative Law Judge (ALJ)

Penny Loucas conducted a hearing at which Plaintiff, represented by counsel Diane Newman, and Vocational

Expert (VE) Mark Anderson, appeared and testified (Docket No. 12, pp. 37 of 508).  The ALJ issued an

unfavorable decision on June 21, 2012 (Docket No. 12, pp. 18-29 of 508).  The Appeals Council denied

review of the ALJ's decision on August 27, 2013, thus rendering the ALJ's decision the final decision of the

Commissioner (Docket No. 12, pp. 5 of 508).

## II. FACTUAL BACKGROUND

**A.    ADMINISTRATIVE HEARING**

### 1.    PLAINTIFF'S TESTIMONY

Plaintiff testified that he was 49 years old and was diagnosed with human immunodeficiency (HIV)

on November 2002 (Docket No. 12, pp. 50-51;59 of 508).  He indicated that he suffers from neuropathy,[1]

muscle weakness, and chronic fatigue (Docket No. 12, pp. 40-41 of 508).  Plaintiff described being in

constant pain which he rated at a level four or five and noted that the pain sometimes escalates as he testified

was the case on the day of the hearing.  He rated his elevated pain at a seven.  Plaintiff reasoned that the

elevated pain was because he had been walking and moving around.  Plaintiff described a typical day,

explaining that he normally stays home, attends church every Sunday, and visits the library once a month

(Docket No. 12, pp. 40-41 of 508).

Plaintiff described his past employment in the financial and mortgage industries, his work and part

ownership in a day care business, and his most recent job in sales and customer service (Docket No. 12, pp.

42-46 of 508). Plaintiff also detailed his past ongoing battle with HIV,  indicating that after being diagnosed

in November 2002, he decided the illness would kill him, chose not to seek treatment and kept working.  By

September 2006, Plaintiff testified that he was noticeably ill, had lost 65 pounds, and was still working in a

---

[1]

      Neuropathy is a condition caused by nerve damage that can cause weakness, numbness and pain in the hands, feet and other parts of the body. *See Peripheral neuropathy Definition - Diseases and Conditions*, MAYO CLINIC, (Mar. 27, 2014, 1:33 PM), http://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/basics/definition/con-20019948

variety of roles at the day care center that he partially owned.  In January 2007, Plaintiff described becoming very ill, passing out at church and being rushed to the hospital by a friend (Docket No. 12, pp. 50-51 of 508). While hospitalized, Plaintiff recalled being informed of a clinical trial program at University Hospital that would provide him free HIV medication.  Plaintiff testified that he immediately enrolled in the program and started treatment, which stabilized the progression of his HIV (Docket No. 12, pp. 51-52).

In response to the ALJ's questions, Plaintiff indicated that he has psychological issues manifested by avoiding his neighbors, isolating himself from others and staying inside his house and being easily intimidated.  Plaintiff reported hearing a voice in his head, which he identified as God talking to him (Docket No. 12, pp. 56 of 508).  With respect to his neurological issues, Plaintiff testified that his neurologist, with whom he has frequent office visits,  is confused by his muscle weakness and wanted to do a biopsy of his leg to determine the cause of his muscle weakness and fatigue (Docket No. 12, pp. 57-59 of 508).

### 2.     VOCATIONAL EXPERT TESTIMONY

The VE  described  Plaintiff's work history as a registered financial representative, a skilled occupation of a sedentary level of exertion, with a specific vocational preparation[2] (hereinafter SVP) level of 7; branch manager at a mortgage business, a skilled occupation of a sedentary exertion level, with a SVP of 8; and daycare worker, a semi-skilled occupation of a light exertion level, with a SVP of 4 (Docket No. 12, pp. 61-65 of 508).

The ALJ then posed her first hypothetical to the VE asking him to assume an individual of similar characteristics to Plaintiff:

. . . in age and education experience, work history and experience . . . who can engage in light

---

[2]

SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  www.onetonlne.org.  SVP is a component of Worker Characteristics information found in the Dictionary of Occupational Titles (DOT), a publication that provides universal classifications of occupational definitions and how the occupations are performed.  www.occupationalinfo.org.

exertion, who can engage at a job that allows for a sit stand option, defined as a job where the essential job duties could still be performed without any loss of . . . off task work . . . sit stand . . . a job defined where the essential job duties could be performed in either a seated or a standing position.  Posturals are limited [to], the following extent.  Never any ladders, any ropes or scaffolds.  Frequent stooping, kneeling and crouching.  Occasional ramps and stairs, crawling and balancing.  Up to occasional fine manipulation bilaterally.  Avoid concentrated exposure to extreme temperatures.  Avoid exposure to hazards and unprotected heights.  As for mental, I'm going to say no limits on memory.  Can maintain concentration, persistence and pace for up to two hours at a time, over a normal eight hour workday and work week.  I should say, normal eight hour workday and normal work week.  No limits on social interaction.  And as far as hand – as far as changes, can adapt to changes in workplace setting but no machine pace driven type work. As you review those limitations in that hypothetical, can you tell me whether or not the claimant's – [whether] or not the claimant can return to any of his past work?

(Docket No. 12, pp. 65-66 of 508).  The VE indicated that the stand and sit option would be difficult with a daycare position because in that role, the employee must accommodatef the children.  With respect to his previous jobs as mortgage broker and branch manager, the VE indicated that those are primarily sedentary jobs and that in order to stand, accommodations would have to be made so that the desk could be raised in order to allow the individual to perform the job while standing.  The VE noted that such desk configurations are not standard in the mortgage brokerage business and would require an employer to bring someone in to make the accommodation (Docket No. 12, 66-68 of 508).

The ALJ asked the VE whether any other work existed that could be performed where the desk accommodation is not a factor.  The VE indicated that the DOT does not address this issue, but noted three jobs that he thought would qualify.  The first job the VE suggested was that of a mail clerk, an unskilled occupation of a light exertion level.  The VE testified that the job of mail clerk is prevalent in the national economy, exclusive to postal workers, and that there are 3,500 such jobs in Northeast Ohio, 9,500 in the State of Ohio, and 195,000 in the United States.  The next job the VE proposed was that of assembler of small products, an unskilled occupation of a light exertion level.  The VE noted that there are 3,500 of these jobs in Northeast Ohio, 10,000 in the State of Ohio, and 217,000 in the United States.  The final job proffered by

4

the VE was that of assembler of electrical accessories, an unskilled occupation of a light exertion level. The VE noted that there are 3,500 of these jobs in Northeast Ohio, 9,000 in the State of Ohio, and 240,000 in the United States. The VE explained that all of these jobs can be performed sitting or standing and are rated "light" because the materials handled exceed the ten-pound threshold for sedentary work (Docket No. 12, pp. 68-69 of 508).

ALJ Loucas posed her second hypothetical noting, ". . . instead of a sit stand option we're going to say light, standing maximum four hours a day. Does that affect your opinion in any way?" (Docket No. 12, pp. 69 of 508). The VE indicated that this hypothetical would not change his opinion with respect to the mail clerk and assembler jobs that he previously described, but noted that the four-hour standing requirement would preclude Plaintiff from his prior sedentary employment because the maximum standing time under sedentary level jobs is two hours (Docket No. 12, pp. 69-70 of 508).

In hypothetical three, the ALJ inquired about the types of employment Plaintiff might be capable of performing that is of a sedentary level of exertion, which does not require a sit and stand option. The VE indicated that Plaintiff would be capable of performing his past jobs as branch manager or loan officer and registered representative. The ALJ asked the VE whether his answer would change if the hypothetical individual were to be off task 20 percent of the day as a result of his pain and other symptoms from his condition  The VE indicated that being off task during 20 percent of the work day would be more than is generally allowed for both skilled and unskilled work (Docket No. 12, pp. 70-72 of 508).

On cross examination, Plaintiff's counsel asked the VE whether there would be jobs for a hypothetical claimant, if in addition to being off task, the individual missed at least four days of work a month. The VE answered citing a recent study that employers generally will tolerate two absences (in a month) before providing the employee with a warning and three absences is generally the threshold. The VE explained that more than three absences a month, if consistent, is not deemed competitive and would not be tolerated by an

5

employer (Docket No. 12, pp. 72 of 508).

**B.    MEDICAL RECORDS**

The case record includes numerous medical records from treating, nontreating, and other sources, which are summarized to the extent those records contain summaries, narratives, and legible notes that are relevant to the case.

**1.    DR. STEVEN BASS, M.D., F.A.C.P.**

- On February 8, 2007, Plaintiff was examined by Dr. Bass at South Pointe Hospital after passing out. The record notes that Plaintiff had been diagnosed with HIV five years earlier, and had never received treatment. The assessment reflects that Plaintiff has advanced HIV and was prescribed Bactrim,[3] Azithromycin,[4] Truvada,[5] and Sustiva.[6] The report indicates that Plaintiff was advised about an Aids Clinical Trial Group (ACTG) at University Hospital (Docket No. 12, pp. 297 of 508).

- On May 10, 2007, Plaintiff visited Dr. Bass for a check up. The record of the visit notes that Plaintiff had enrolled in the ACTG. Plaintiff was documented as feeling "quite sluggish," complained of neuropathic symptoms, had an elevated CD4 count, and decreased viral load. Plaintiff was documented having difficulty ambulating due to numbness, had good pedal pulses and no atrophic changes in his legs or significant adenopathy. (Docket No. 12, pp. 298 of 508).

- On March 27, 2008, Plaintiff again saw Dr. Bass for a check up. The treatment records note that Plaintiff was doing well in the ACTG open label study, but still having symptoms of

---

3

Bactrim is a combination of antibiotics used to treat a wide variety of bacterial infections and a certain type of pneumonia. *Bactim DS Oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Apr. 1, 2014, 9:57 AM), http://www.webme.com/drugs/drug-5530-Bactrim+DS+Oral.aspx?drugid=5530.

4

Azithromycin is used to treat bacterial infections by stopping the growth of bacteria. *Azithromycin oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Apr. 1, 2014, 10:00 AM), http://www.webmd.com/drugs/mono-3223-AZITHROMYCIN+250%2F500+MG+-+ORAL.aspx?drugid=1527&drugname=azithromycin+oral.

5

Truvada is used in conjunction with other HIV medications to control the infection and help improve the immune system. *Truvada oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Apr. 1, 2014, 10:02 AM), http://www.webmd.com/drugs/drug-91482-truvada+oral.aspx?drugid=91482&drugname=truvada+oral

6

Sustiva is used with other HIV medications to control the infection. Sustiva oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing, WebMD (April, 1, 2014, 10:04 AM), http://www.webmd.com.drugs/drug-16567-Sustiva+Oral.aspx drugid=16567&drugname=Sustiva+Oral.

neuropathy, was quite fatigued, and his blood contained elevated levels of CK (Creatine Kinase), the cause of which was unknown.[7] Plaintiff was described as awake, alert, not in acute distress, having good proximal muscle strength, and no muscle tenderness. The assessment documented his HIV as being in good control. Dr. Bass ordered a CK determination and included a notation for a follow up visit in three months (Docket No. 12, pp. 301 of 508).

- On September 10, 2009, Plaintiff had a check up with Dr. Bass. The treatment records indicate that Plaintiff's treatment study was ending soon. Plaintiff was described as doing quite well, but that he was still experiencing neuropathic symptoms in his feet. Plaintiff's medications were listed as Atazanavir, Ritonavir, and Truvada. The assessment portion of the record indicated that Plaintiff is clinically quite stable. The plan reflects that Dr. Bass would continue seeing Plaintiff every three months, and labs would be ordered at University Hospital (Docket No. 12, pp. 299 of 508).

The case record contains a Social Security Administration (SSA) form titled "Medical Report on Adult with Allegation of Human Immunodeficiency Virus (HIV) Infection," which was completed and signed by Dr. Bass on January 7, 2010. The form indicates that Plaintiff's HIV diagnosis was confirmed by laboratory testing, includes remarks that Plaintiff was "clinically stable and quite functioning," and noted that Plaintiff was on HIV medication (Docket No. 12, pp. 338-339 of 508).

## 2. LABORATORY REPORTS

A number of laboratory reports are contained in the case record pertaining to Plaintiff's HIV and neuropathy treatment. The undersigned has reviewed all of the lab reports and included summaries below to the extent they contain narratives, medical findings, conclusions, and are relevant to the issues before the Court.

- On September 14, 2009, a Lab Report detailing blood analysis for Plaintiff reflects that his blood contained high levels of Lactate Dehydogenase (LD),[8] alkaline phosphatase, and

---

[7] Creatine Kinase (CK) and Creatine Phosphokinease (CPK) are sometimes used interchangeably and is a test that measure the amount of protein in the blood. *See Creatine Kinase (Blood) - Online Medial Encyclopedia*, UNIVERSITY OF ROCHESTER MEDICAL CENTER, (Apr. 1, 2014, 10:43 AM), http://www.urmc rochester.edu/encyclopedia/content.aspx?Contenttype ID=167&ContentID=creatine_kinase_blood).

[8] Test ID:LD Lactate Dehydrogenase (LD). *See LD - Clinical: Lactate Dehydrogenase (LD), Serum*, MAYO

bilirubin.  The report also indicates that Plaintiff had a critically high level of CK in his blood, had a low white blood cell count (WBC), high red blood cell count (RBC), and low mean corpuscular volume (MCV), and mean corpuscular hemoglobin concentration (Docket No. 12, pp. 332; 335 of 508).

- On February 11, 2010, the results of a complete blood count (CBC) and differential test reflect that Plaintiff's blood contained low levels of MCV and MCHC and that Plaintiff had a high RBC (Docket No. 12, pp. 377 of 508).  Plaintiff's high RBC was also confirmed by a glucose-6-phosphate dehydrogenase (G6PD)[9] test (Docket No. 12, pp. 382 of 508).  A comprehensive panel blood test reported results within the normal range  (Docket No. 12, pp. 381 of 508). Plaintiff's viral load test indicated that Plaintiff's HIV viral load could not be detected (Docket No. 12, pp. 384 of 508). The results of red cell morphology noted few RBC fragments, ovalocytes, and burr cells (Docket No. 12, pp. 387 of 508).

- On February 16, 2010, Plaintiff underwent a MRI scan of his head.  Interpreting Physician Dr. Barbara Bangert noted unremarkable images, and concluded that there was no evidence of intracranial hemorrhage, mass or edema.  She noted minimal cerebellar tonsillar ectopia but specified that it did not meet the imaging criteria for Chiari I malformation[10] (Docket No. 12, pp. 376 of 508).

- On March 16, 2010, comprehensive panel blood analysis reflects that Plaintiff's glucose level was low and that his alkaline phosphatase level was high (Docket No. 12, pp. 368 of 508). Plaintiff's viral load test results indicated that Plaintiff's viral load count could not be detected (Docket No. 12, pp. 370 of 508).  A summary of Plaintiff's red cell morphology indicated that he had few RBC fragments and ovalocytes (Docket No. 12, pp. 372 of 508).  CBC and differential results indicate that Plaintiff had a high RBC, and noted low readings for hemoglobin count (HGB), MCV, and MCHC (Docket No. 12, pp. 374-375 of 508).

- On October 19, 2010, Plaintiff underwent a comprehensive panel blood test.  The results of that testing indicate Plaintiff had high levels of alkaline phosphatase and bilirubin in his blood. CBC and differential test results noted low levels of HGB, MCV, MCHC, and a high coefficient of variation of the red cell width (RDW-CV%) (Docket No. 12, pp. 361-362 of 508).

---

CLINIC, (Apr. 21, 2014, 1:31 PM), http://www.mayomedicallaboratories.com/test-catalog/Clinical+and+Interpretive/8344.

[9]

G6PDis an enzyme that helps red blood cells function properly.  The test monitors the activity of the enzyme in the patients red blood cells. Glucose-6-phosphate dehydrogenase: MedlinePlus Medical Encyclopedia, U.S. Dept. of Health & Human Servs. Nat. Inst. of Health, (Apr. 2, 2014, 10:00 AM), http://www.nlm.nih.gov/medlineplus/ency/article/003671.htm.

[10]

Chiari I malformation is a condition in which brain tissue extends into the spinal canal. *Chiari malformation Definition - Diseases and Conditions*, MAYO CLINIC, (Apr. 21, 2014, 1:39 PM), http://www.mayoclinic.org/diseases-conditions/chiari-malformation/basics/definition/con-20031115.

- On January 31, 2011, CBC and Differential testing reflects that Plaintiff had a high RBC, low MCV and MCHC (Docket 12, pp. 400 of 508).

- On March 21, 2011, the results of Plaintiff's CBC and differential testing reflected low MCV and MCHC levels (Docket No. 12, pp. 402 of 508).

3.     **DR. CARLOS SUBAUSTE, M.D.**

   a.     **PATIENT TREATMENT NOTES**

The case record contains handwritten treatment notes from three physical examinations Plaintiff had

with Dr. Subauste, which are summarized to the extent they are legible.

- On March 25, 2010, Plaintiff saw Dr. Subauste for a physical examination.  The exam notes reflect that Plaintiff had not missed any of his medications and reported his pain level at 0. A notation concerning Plaintiff's neuropathy is also included in the notes, but is illegible (Docket No. 12, pp. 417 of 508).

- On June 24, 2010, Plaintiff again visited Dr. Subauste and the examination notes indicate that Plaintiff had not missed any of his medications, detailed his vitals, and noted that Plaintiff was experiencing pain in his feet. While the record contains additional notes, they, too, are illegible (Docket No. 12, pp. 416 of 508).

- On October 28, 2010, Plaintiff saw Dr. Subauste for an examination. The notes reflect that Plaintiff had not missed any of his medications, report his pain level at zero, and contain a note that Plaintiff may have gone off  his medications for two weeks in August in an attempt to address his foot pain (Docket No. 12, pp. 415 of 508).

   b.     **HIV MEDICAL ASSESSMENT FORM**

On February 23, 2012, Dr. Subauste completed a medical assessment form concerning Plaintiff's HIV

infection and ability to perform work related activities.  The assessment notes that Plaintiff is HIV positive,

and suffers from severe peripheral neuropathy, condyloma acuminatum, myopathy, depression, and has

suffered from pneumonia (non-PCP) (Docket No. 12, pp. 483 of 508).   Dr. Subauste noted that Plaintiff's

ability to lift and carry objects are affected by his impairment and that the maximum amount of weight he

can lift or carry with any frequency during an eight-hour work day is six pounds.  With respect to standing

and walking, Dr. Subauste also indicated that Plaintiff's abilities are affected by his impairment but failed

to provide any quantitative limitations for these functions.   Dr. Subauste noted Plaintiff has no limitations in sitting, but indicated that Plaintiff would need to take unscheduled breaks, however; in the space provided for his opinions concerning the frequency of such breaks, Dr. Subauste rendered no response (Docket No. 12, pp. 483 of 508).

Dr. Subauste indicated that Plaintiff could never perform the postural activities of climbing, balancing, and crawling.  He also noted that Plaintiff could occasionally perform the activities of stooping, crouching, and kneeling.  In support of these findings, Dr. Subauste noted "severe peripheral neuropathy and likely myopathy."  With respect to physical functions, Dr. Subauste indicated that Plaintiff has no limitations, but included a notation that Plaintiff has severe imbalances due to neuropathy and muscle weakness.  Dr. Subauste noted his medical findings in support of his opinion concerning Plaintiff's physical functions listing decreased vibratory  sensation in feel, decreased pin prick sensation in the feet/legs, and decreased muscle strength (Docket No. 12, pp. 484 of 508).

Dr. Subauste indicated Plaintiff is environmentally restricted by heights, moving machinery, temperature extremes, chemicals, noise, and fumes.  No answers were included for the environmental restrictions of dust, humidity, and vibration.  In support of these restrictions, Dr. Sadauste noted that Plaintiff has a tendency to fall and references a neurological examination. In the final section of the assessment, Dr. Sadauste indicated that Plaintiff would be likely to be absent from work due to his impairments or treatment more than four days per month (Docket No. 12, pp. 484 of 508).

4.    DR. BARBARA E. SHAPIRO, M.D., PH. D.

The record contains a letter summarizing Dr. Shapiro's neurological examination of Plaintiff on February 25, 2010.  The summary reflects that Plaintiff sought an evaluation for headaches, dizziness, and peripheral neuropathy. Plaintiff's medical history is detailed, including a note that he has experienced

difficulty walking since September 2006, has unstable gait, and was diagnosed with peripheral neuropathy, which predates his treatment for HIV.  Dr. Shapiro noted Plaintiff was taking Neurontin for cold and burning sensations in his feet, but that the medication had not alleviated his symptoms (Docket No. 12, pp. 342 of 508).

Dr. Shapiro described Plaintiff as well appearing and in no apparent distress, his mental status was noted as unremarkable, and she reported no obvious deficits with respect to Plaintiff's attention, memory or language.  Dr. Shapiro indicated that Plaintiff's gait was somewhat slowed, that he has difficulty with heel walking, toe walking, and poor tandem gait.  The records from the exam note that Romberg testing causes Plaintiff to fall, but that he was able to perform functional testing, including rising from a chair, with no difficulty.  After reviewing Plaintiff's MRI, she indicated that Plaintiff's brain did not meet the criteria for Chiari I malformation and was otherwise normal (Docket No. 12, pp. 343-344 of 508).

With respect to his peripheral neuropathy, Dr. Shapiro ordered blood studies to look for treatable causes of the condition.  The treatment notes also indicate that Dr. Shapiro gave Plaintiff a requisition for physical therapy to evaluate his gait and neuropathy, and that he was to return for a follow up with Dr. Shapiro in a month (Docket No. 12, pp. 344-345 of 508).

An Addendum dated March 9, 2010, documented a follow up conversation with Plaintiff and notes that he was still taking his Neurontin medication, but had not noticed any improvement in his symptoms.  He complained of numbness and experiencing hot and cold sensations in his feet.  Plaintiff was instructed to increase his dosage of Neurontin.  It was otherwise noted that Plaintiff reported his headaches were better, but indicated that he still had bouts of dizziness, which are occurring less frequently (Docket No. 12, pp. 345 of 508).

11

An Electromyography Laboratory Report (EMG)[11] dated September 19, 2011 reported the results of a nerve conduction studies and needle examination.  Dr. Shapiro's impression notes from the report reflects that there was "electrophysiologic evidence of a moderately severe, generalized, active and chronic, axonal, motor and sensory polyneuropathy" (Docket No. 12, pp. 495 of 508).

### a.    PHYSICAL RESIDUAL FUNCTIONAL CAPACITY (RFC) ASSESSMENTS

The record includes two RFC assessments from Dr. Shapiro concerning Plaintiff's work related capabilities, which are dated February 9, 2012 and May 15, 2012, respectively.  Both assessments similarly conclude that Plaintiff cannot lift,[12] carry, stand, or walk during an eight-hour work day because of profound weakness in his legs and unstable gait.  Dr. Shapiro reported no impairment in Plaintiff's ability to sit, but indicated that he could not sit for more than three or four hours during a work day and no more than one hour without interruption (Docket No. 12, pp. 477; 503 of 508).  She indicated that Plaintiff could never perform the postural activities of climbing, balancing, stooping, crouching, kneeling, and crawling.  With respect to physical functions, Dr. Shapiro noted that Plaintiff's ability to reach, handle, feel, and push and pull were affected by his impairment.  She indicated that Plaintiff has sensory loss because of his neuropathy, has difficulty feeling in his hands and feet, and has weaknesses in his legs.  She noted no physical function limitations in Plaintiff's ability to see, hear, and speak (Docket No. 12, pp. 478; 504 of 508). In addition to physical limitations, Dr. Shapiro assessed environmental restrictions for all of the listed environmental factors, noting that Plaintiff "cannot be exposed to these elements" and that he "has psychiatric problems that

---

[11]

An electromyogram is a test that measures the electrical activity of muscles while the patient is at rest and during contraction. *Electromyogram (EMG) and Nerve Conduction Studies*, WEBMD, (Apr. 4, 2014, 2:19 PM), http://www.webme.com/brain/electromyogram-emg-andnerve-conduction-studies.

[12]

Interestingly, the only obvious difference between the February and May 2012 assessments is that in February, Dr. Shapiro noted that Plaintiff could lift things weighing 0 pounds, but could not carry anything. Three months later, Dr. Shapiro noted that Plaintiff could neither lift or carry any items.

might interfere with some of these environmental restrictions." Dr. Shapiro noted that Plaintiff was likely to be off task for 25% of more of the work day and would be absent from work as a result of his impairment or treatment for more than four days per month (Docket No. 12, pp. 478; 504 of 508).

### 5.     DR. S. PARRISBALOGUN , M.D.[13]

On February 15, 2012, Dr. Parrisbalogun completed a medical source assessment form concerning Plaintiff's mental limitations. The form consists of a list of 20 mental activities which are divided into four categories: Understanding and Memory; Sustained Concentration and Persistence; Social Interaction; and Adaptation. For each mental activity listed, Dr. Parrisbalogun was asked to assess a score on a sliding scale of one to five, based upon the percentage of time the patient was expected to be distracted from the task (Docket No. 12, pp. 480 of 508).

Dr. Parrisbalogun's assessment indicates that Plaintiff has or will have noticeable difficulty during more than 20 percent of the work day or work week (a score of four out of five), in 15 of the 20 mental activities listed.  Those mental activities include: remembering locations and work-like procedures; understanding and remembering very short, simple instructions; understanding and remembering detailed instructions; carrying out very short and simple instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods of time; performing activities within a schedule, maintaining regular attendance, and/or being punctual within customary tolerances; sustaining ordinary routine without special supervision; working in coordination with or proximity to others without being distracted by them; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and

---

[13]

The case record and Plaintiff's briefs contain two different spellings for Dr. Parrisbalogun's name.  The State Medical Board of Ohio spells Dr. Stefi N. Parrisbalogun's name accordingly. *See Roster of Registered Physicians*, p. 677, STATE MEDICAL BOARD OF OHIO, (Apr. 21, 2014, 1:59 PM), http://www.med.ohio.gov/Rosters/35-MD-Active-ALPHA.pdf

length of rest periods; interacting appropriately with the general public; responding appropriately to changes in the work setting; traveling in unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others (Docket No. 12, pp. 480-481 of 508).

Of the five remaining mental activities, Dr. Parrisbalogun's assessment of Plaintiff was that he has or would have noticeable difficulty during 11 to 20 percent of the work day or work week in tasks such as: asking simple questions or requesting assistance, understanding instructions and responding appropriately to criticism from supervisors, getting along with coworkers or friends without distracting them or exhibiting extreme behavior, and being aware of normal hazards and taking appropriate precautions.  For the only remaining mental activity of maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness, Dr. Parrisbalogun indicated that Plaintiff would have no limitations (Docket No. 12, pp. 481 of 508). Dr. Parrisbalogun also indicated that Plaintiff would miss about four days of work a month and noted that his assessment is based on Plaintiff's "extreme anxiety, agoraphobia and mild depression." Dr. Parrishalogun reported that "these symptoms predisposed Plaintiff to decreased ability with social interactions and adaptation mostly with some concentration, memory, and comprehension difficulties, which would be considered moderate" (Docket No. 12, pp. 481 of 508).

### 6.    MENTAL HEALTH COUNSELING - KATHRYN L. RAVEN, LPCC

The case record includes a letter dated May 28, 2012, from Counselor Raven, which summarizes her care of Plaintiff.  She indicates that Plaintiff was referred for Mental Health Counseling in January 2012, by Dr. S. Parrisbalogun for counseling related to depression, increased anxiety with agoraphobia and panic attacks.  Ms. Raven noted that Plaintiff has been inconsistent with his counseling sessions.  She indicated that Plaintiff had relayed to her that he was depressed, had difficulty leaving his home, was unconvinced that his life would change or improve with counseling, but had indicated that he was looking for small things to change in his life (Docket No. 12, pp. 508 of 508).

14

Ms. Raven opined that continuing consistent counseling would assist Plaintiff in managing his anxiety, which she blamed for his difficulty in maintaining his scheduled counseling sessions.  Ms. Raven reported that Plaintiff expressed his willingness to give counseling a try and noted that he had attended a Psy-Educational Group on anxiety and kept his last two individual counseling sessions.  Ms. Raven's letter indicates that Plaintiff has expressed a desire to return to work and noted his last job did not go well.  Ms. Raven's notations reflect that  Plaintiff continues to experience distress and panic attacks in social situations and she opines that it would not be advisable to have him employed in a public work setting, instead recommending a home based job and warning that even then, his depression might interfere with his ability to complete tasks on schedule (Docket No. 12, pp. 508 of 508).

## C.    AGENCY EVALUATIONS

### 1.    PHYSICAL RFC ASSESSMENT - DR. WALTER HOLBROOK, M.D.

The record contains a physical RFC assessment completed by State Agency Medical Consultant, Dr. Holbrook which is dated March 3, 2010 (Docket No. 11, pp. 346-353 of 508).  Dr. Holbrook's RFC findings reflect that Plaintiff can occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk for six hours, sit for a total of approximately six hours during an eight hour work day, and has an unlimited ability to push and pull.  In support of his findings, Dr. Holbrook cited medical records from Dr. Bass, which noted symptoms of neuropathy and fatigue, but that Plaintiff's HIV was in good control in March 2008.  Dr. Holbrook also referenced Dr. Bass' Medical Source Statement dated January 7, 2010, which indicated that Plaintiff was clinically stable and quite functional (Docket No. 12, pp. 347-348 of 508).

Dr. Holbrook assessed postural activity limitations for Plaintiff indicating that he can never climb ladders, ropes, or scaffolds (Docket No. 12, pp. 348 of 508).  Dr. Holbrook noted no manipulative, visual, communicative or environmental limitations for Plaintiff (Docket No. 12, pp. 349-350 of 508).  In detailing Plaintiff's symptoms, Dr. Holbrook indicated that they are attributable to a medically determinable

15

impairment, but that the severity or duration of Plaintiff symptoms is disproportionate to the expected severity or duration of the impairment. Dr. Holbrook also noted that in his judgment the severity of Plaintiff's symptoms was not consistent with the medical and non medical evidence, Plaintiff's statements, and observations of activities of daily living explaining that while Plaintiff's statements are partially credible, the objective evidence shows that he is clinically stable and quite functional while on medication (Docket No. 12, pp. 351 of 508).

## 2.    PSYCHOLOGIST DAVID V. HOUSE, PH.D.

On April 21, 2011, Plaintiff had a consultative examination concerning his mental status with Dr. House, which was requested by the Division of Disability Determination (Docket No. 12, pp. 425 of 508). Dr. House's findings are summarized in a ten-page report included in the case record.  The summary reflects that  Plaintiff is 47 years of age, has never been married, and has no children.  The report details Plaintiff's background and history including his family, educational, legal, medical and work history.  Dr. House noted that Plaintiff has an Ohio driver's license, and that he had borrowed a friend's car to attend the appointment. Dr. House described Plaintiff as seeming rather fragile in manner, but otherwise noted Plaintiff's grooming and hygiene as adequate, seeming able to ambulate without difficulty, and subdued in manner (Docket No. 12, pp. 426-427 of 508).

Plaintiff reported having no friends, and having no community involvement, but noted that he attends church on the first Sunday of every month. (Docket No. 12, pp. 426 of 508).  Plaintiff's medical history includes his HIV diagnosis, and reflects that Plaintiff denied any major physical effects from the illness.  With respect to psychiatric care, Plaintiff reported having previously been in counseling, but not under the care of any mental health professional on the date of his evaluation.  Plaintiff indicated having previously been treated for depression and prescribed Celexa, but noted that he never took the medication because he could not afford the prescription (Docket No. 12, pp. 427 of 508).  Dr. House detailed two unsuccessful suicide

16

attempts described by Plaintiff, and noted that Plaintiff denied having any plan or intention of ending his life on the day of the examination (Docket No. 12, pp. 428 of 508).  Dr. House also documented Plaintiff's post traumatic stress (PTSD) issues, mood swings, anxiety, panic attacks, and obsessive compulsive behavior (Docket No. 12, pp. 427-429 of 508).

Dr. House's report details his findings concerning Plaintiff's mental content, bodily concerns, sensorium and cognitive functioning, insight and judgement, and daily activities (Docket No. 12, pp. 429-431 of 508).  Dr. House concluded that Plaintiff suffers from Mood Disorder secondary to HIV infection with major depressive features, Panic Disorder with agoraphobia, Obsessive Compulsive Disorder and Post-traumatic Stress Disorder (Docket No. 12, pp. 431 of 508).   Dr. House's functional assessment reported issues with Plaintiff's short term memory, indicated that he appears confused, and that his concentration appears interrupted with respect to computational skills (Docket No. 12, pp. 432 of 508).  Dr. House also indicated that Plaintiff will have some difficulties relating to others due to his level of confusion and anxiety. He also noted that Plaintiff is socially isolated and that this behavior appears to be increasing (Docket No. 12, pp. 433 of 508).   Dr. House otherwise indicated that there was evidence that Plaintiff may be decompensating to some degree and that his levels of compulsivity may facilitate the emergence of a delusional disorder or some type of delusional system and paranoia.  Dr. House opined that Plaintiff's anxiety and more frequent panic attacks would likely prove quite disruptive in a work setting (Docket No. 12, pp. 433 of 508).  Dr. House assessed Plaintiff a Global Assessment of Functioning (GAF) score of 41,[14] noting a relatively poor prognosis for Plaintiff depending on his HIV treatment and citing the emergence of PTSD symptoms, compulsivity, and increasing social isolation (Docket No. 12, pp. 434 of 508).

---

[14]

A Global Assessment of Functioning Score of 41 reflects "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). *Tinsley v. Astrue*, 2008 WL 4724494, *2 (W.D. Ky. 2008)(not reported)(*citing* AM. PSYCHIATRIC ASS'N DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS, 4th Ed. ("DSM-IV"), *Global Assessment of Functioning scale*).

3.    DR. DARIUSH SAGHAFI, M.D.

On July 21, 2011, Plaintiff was examined by Dr. Saghafi for the purpose of conducting a consultative physical examination at the request of the State Agency.  Dr. Saghafi's records reflect that Plaintiff's chief medical complaint was neuropathy and detailed his symptoms.  The notes indicate that Plaintiff's neuropathy was believed to be a consequence of his HIV infection (Docket No. 12, pp. 440 of 508).

The results of Plaintiff's neurological exam reported no acute distress and that Plaintiff sometimes walks with the assistance of a cane.  Following an examination, Plaintiff's skin, head and neck, heart, lungs, abdomen, visual acuity, mental status, speech and language, cranial nerves, and motor examinations revealed no abnormalities.  Dr. Saghafi's notes reflect that Plaintiff had normal strength and range of motion (Docket No. 12, pp. 440-441 of 508).  Dr. Saghafi's sensory examination of Plaintiff reports that with respect to light touch, Plaintiff had significant and dramatic proximal to distal loss of tactile sensation from the knees distally or nearly 80-90% in both lower extremities.  Plaintiff's cerebellar examination noted "some failure of precision during the finger to nose test on his right side,  which is not nearly as pronounced as on the left."  Plaintiff gait was documented as normal when his eyes are open, but that he is a moderate fall risk when his eyes are closed (Docket No. 12, pp. 441-442 of 508).

Dr. Saghafi's neurological impression reflects that Plaintiff suffers from HIV neuropathy which was described as being "predominantly present in the lower extremities" and indicated that Plaintiff "states that this prevents him from having either a physically exertional or sedentary job" due to pain and the need to move around.  Dr. Saghafi's findings however, report that Plaintiff "is able to lift, push, and pull sufficiently and being able to perform ADL's."  Dr. Saghafi indicated that Plaintiff's "educational background and capacity to work in at least a  part-time position in light duty jobs where intermittent ability to move about or change position would be possible."  While Dr. Saghafi noted Plaintiff would not do well in a position requiring heavy lifting or carrying of heavy loads due to a lack of coordination and balance on his right side,

he described Plaintiff as being able to bend, walk, and stand for 15-20 minutes at a time.  He also described Plaintiff as being able to understand the environment, his peers and communicate satisfactorily and travel independently (Docket No. 12, pp. 442 of 508).

### III. STANDARD OF DISABILITY

The Social Security Act sets forth a five-step sequential evaluation process for determining whether an adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Comm'r Soc. Sec.*, 2014 WL 916945, *2 (N.D. Ohio 2014).  At step one, a claimant must demonstrate she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th cir. 2007)(citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  At step two, the claimant must show that she suffers from a "severe impairment." *Colvin*, 475 F.3d at 730.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (citing *Abbott*, 905 F.2d at 923).  At step three, the claimant must demonstrate that her impairment or combination of impairments meets or medically equals the listing criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(d) (West 2014).  If the claimant meets her burden she is declared disabled, however, if she does not, the Commissioner must determine her residual functional capacity. 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is "the most [the claimant] can still do despite [the claimant's] limitations."  20 C.F.R. § 416.945(a) (West 2014)*.*  In making this determination, the regulations require the Commissioner to consider all of the claimant's impairments, including those that are not "severe." 20 C.F.R. § 416.945(a)(2) (West 2014).  At the fourth step in the sequential analysis, the Commissioner must determine whether the claimant has the residual functional capacity to perform the requirements of the claimant's past relevant work. 20 C.F.R. § 416.920(e) (West 2014).  Past relevant work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of

19

the established disability), which was substantial gainful work, and lasted long enough for the claimant to learn to do it. 20 C.F.R. §§ 416.960(b), 416.965(a) (West 2014). If the claimant has the RFC to perform her past work, the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014).  If, however; the claimant lacks the RFC to perform her past work, the analysis proceeds to the fifth and final step. *Id.*

The final step of the sequential analysis requires the Commissioner to consider the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can make an adjustment to other work available. 20 C.F.R. §§ 416.920(a)(4)(v), (g) (West 2014).  While the claimant has the burden of proof in steps one through four.  The Commissioner has the burden of proof at step five to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  The Commissioner's finding must be "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)(citation omitted).  If a claimant can make such an adjustment the claimant will be found not disabled. 20 C.F.R. §§ 416.920(a)(4)(v), (g) (West 2014).  If an adjustment cannot be made then the claimant is disabled. *Id.*

## IV. ALJ's FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Loucas made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.  The claimant has not engaged in substantial gainful activity since March 31, 2008, the alleged onset date.

3.  The claimant has the severe impairments of peripheral neuropathy, HIV, affective disorder, and anxiety.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404,

20

Subpart P, Appendix 1.

5.   The claimant has residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a), except that his ability to perform a full range of sedentary exertional work is reduced by additional limitations.  Specifically, the claimant can never climb ladders, ropes, or scaffolds.  He can frequently stoop, kneel, and crouch.  The claimant can occasionally climb ramps and stairs, occasionally crawl, and occasionally balance.  He can perform up to occasional fine manipulation bilaterally.  The claimant must avoid concentrated exposure to extreme temperatures and avoid exposure to hazards and unprotected heights.  He has no limitation on memory.  The claimant can maintain concentration, persistence, and pace for up to two hours at a time over a normal eight-hour workday and normal workweek.  He has no limits on social interaction.  The claimant can adapt to changes in workplace setting but cannot work at machine pace driven type work.

6.   The claimant is capable of performing past relevant work as a registered financial representative and branch manager.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7.   The claimant has not been under a disability, as defined in the Social Security Act, from March 31, 2008, through the date of this decision.

## V. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006).  On review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Miller*, 2014 WL 916945, at *3 (quoting 42 U.S.C. § 405(g)). "The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Cole v.*

*Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance." *Miller*, (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)). "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Cole*, 661 F.3d at 937 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted).

## VI. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that ALJ Loucas' decision that Plaintiff is not disabled is not supported by substantial evidence.  Plaintiff principally contests ALJ Loucas' RFC analysis and findings.  In support, Plaintiff essentially argues that ALJ Loucas: (1) failed to comply with the treating physician rule and the factors set forth in 20 C.F.R. § 404.1527 and § 416.927, in discounting the opinions of treating physicians Dr. Shapiro, Dr. Subauste, Dr. Parrisbalogun, and "consulting examiner," Dr. House; (2) improperly relied upon the opinions of Dr. Saghafi and Dr. Bass in finding that Plaintiff could perform sedentary level work in her RFC analysis; (3) made RFC findings that are both inconsistent with the case record and law; and (4) substituted the opinions of medical professionals with her own (Docket No. 15, pp. 12-18 of 19; Docket No. 18, pp. 1-10 of 11).

### B.    DEFENDANT'S RESPONSE

Defendant disagrees and argues that substantial evidence supports the ALJ's determination that Plaintiff is capable of performing sedentary exertional work subject to the limitations assessed by the

ALJ.  Defendant also argues that the ALJ appropriately evaluated and weighed the opinions of Plaintiff's treating and examining medical sources given the evidence in the record (Docket No. 17, pp. 11-15 of 16).

**C.    DISCUSSION**

**1.    MEDICAL SOURCE OPINIONS**

In his first assignment of error, Plaintiff alleges that the ALJ failed to comply with the treating physician rule in discrediting the opinions of Dr. Shapiro, Dr. Subauste, Dr. Parrisbalogun, and consulting examiner Dr. House (Docket No. 15, pp. 12 of 19).  Defendant disagrees and contends that the weight ALJ Loucas assigned the opinions of Plaintiff's treating and consulting physicians, and counselor are appropriate based upon the objective medical record (Docket No. 17, pp. 12-15 of 16).  Since Plaintiff's contentions concerning the credibility assessed by the ALJ are interwoven with his RFC arguments, both are addressed together in this discussion.

**a.    THE TREATING PHYSICIAN RULE**

The Social Security Act prescribes certain standards that an ALJ must comply with in assessing the medical evidence contained in the record.  One such standard is the treating physician rule which requires that a treating physician's assessment be given controlling weight so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and not otherwise "inconsistent with the other substantial evidence in the case record." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also* SSR 96-2P, 1996 WL 374188, *1 (July 2, 1996)("Controlling weight may not be given to a treating source's opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.") The regulations provide the rationale for the rule, noting that treating physicians "are likely to be the medical

23

professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2) (West 2014).

If the treating physician's opinion is not afforded controlling weight, the regulations require that the Commissioner consider a list of factors set forth in the regulations for determining the appropriate weight to attribute to the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(c)(6), 416.927 (West 2014); *Blakley*, 581 F.3d at 406.  Those factors include: the length of the treatment relationship and frequency of examination; the nature and extent of the treatment relationship; the relevant evidence provided in support of the opinion; the quality of the explanation; the consistency of the opinion with the record as a whole; and any other relevant factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(c)(6), 416.927 (West 2014).

In addition to applying the factors identified in the regulations, the ALJ must provide "good reasons" for discounting a treating physician's opinion, which is "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (citing SSR 96-2, 1996 WL 374188, *5); *Blakley*, 581 F.3d at 407.  In *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004), the Sixth Circuit recognized that "'[t]he requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where the claimant knows that his physician has deemed him disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).  "The requirement also ensures that the ALJ applies the treating physician rule and permits meaning review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.

24

The *Wilson* court stated that to meet this obligation of providing reasons for discounting a treating source's opinion, the ALJ must (1) state that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with the other evidence in the case record; (2) identify evidence supporting such findings; and (3) explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion. *Allums v. Comm'r of Soc. Sec.*, 2013 WL 5437046, *3 (N.D. Ohio 2013) (citing *Wilson*, 378 F.3d at 546).

Before assigning any weight to the opinions of a claimant's medical sources, the ALJ must determine which physicians or psychologists are "treating sources." A physician or psychologist "is a treating source if he has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . . 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation that is typical for the treated condition(s).'" *Blakley*, 581 F.3d at 407 (quoting 20 C.F.R. § 404.1502). A nontreating source, on the other hand, is defined as a "physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you," which includes a consultative examiner for the agency. *See* 20 C.F.R. § 404.1502 (West 2014).

### b. DR. BASS

In her decision, ALJ Loucas referred to Dr. Bass as a treating physician and afforded his opinion great weight in her analysis. She indicated that Dr. Bass has been one of Plaintiff's treating physicians for a number of years, giving him valuable perspective in assessing Plaintiff's health and functional abilities. ALJ Loucas highlighted the consistency of Dr. Bass' treatment notes concerning Plaintiff's presentation and his finding that Plaintiff is clinically stable.

Plaintiff argues that ALJ Loucas erred in relying upon Dr. Bass' findings that Plaintiff was stable because Dr. Bass was not asked to render an opinion concerning Plaintiff's functionality at competitive

work (Docket No. 15, pp. 16 of 19).  Defendant disagrees and contends that ALJ Loucas appropriately relied upon the relevant medical findings of Dr. Bass in making her determination concerning Plaintiff's RFC (Docket No. 17 pp. 12-13 of 16).  Defendant also disagrees with Plaintiff's assertion that ALJ Loucas only focused on Dr. Bass' findings that Plaintiff was clinically stable arguing instead that the ALJ relied upon Dr. Bass' treatment notes describing Plaintiff's alertness, lack of distress, strength and range of motion (Docket No. 17, pp. 12-13 of 16).

Plaintiff's assertion that ALJ Loucas improperly relied upon Dr. Bass' opinion is incorrect.  The regulations note that the evidence assessed in making a RFC determination consists of  "all of the relevant evidence in your case record," *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (West 2014). This evidence includes the claimant's medical history, statements concerning a claimants capabilities from medical and other sources, and the claimant's own subjective statements concerning their impairments. *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) (West 2014).  The Plaintiff cites no legal authority in support of his assertion that ALJ Loucas improperly relied upon Dr. Bass' opinion because he was not asked to render an opinion concerning Plaintiff's capabilities for work related activities.

Plaintiff also alleges in his Reply Brief that ALJ Loucas ignored Dr. Bass' findings concerning Plaintiff's neuropathy and fatigue (Docket No. 18, pp. 4 of 11).  But there is no requirement that an ALJ discuss every piece of evidence. *Dickey-Williams v. Comm'r of Soc. Sec.*, 2013 WL 5476019, *7 (E.D. Mich. 2013)(*see generally Kornecky v. Comm'r of Soc. Sec*., 167 Fed.Appx. 496, 507-08 (6th Cir. 2006)(" . . .an ALJ can consider all the evidence without directly addressing in [her] written decision every piece of evidence submitted by a party.  Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as [her] factual findings as a whole show that [she] implicitly resolved such conflict.) ALJ Loucas' decision extensively details Plaintiff's neuropathy symptomatology and includes a citation to one of Dr. Bass' treatment records, which includes Plaintiff's complaints of

26

fatigue and neuropathy (Docket No. 12, pp. 24; 301 of 508).

Finally, Plaintiff argues that with respect to Plaintiff's physical health, that Dr. Bass' opinion is consistent with all the other medical opinions in the record including Dr. Saghafi's, which conclude that Plaintiff cannot perform full-time work (Docket No 18, pp. 7 of 11).  The undersigned has carefully reviewed the record in this case and fails to find any notation, finding, or opinion rendered by Dr. Bass that Plaintiff cannot perform full-time work, but even if Dr. Bass had made such a finding it would not be binding on the ALJ.  The determination of whether a claimant is disabled is the prerogative of the Commissioner, not Plaintiff's treating physician.  *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th Cir. 2004)(citations omitted).  The undersigned also notes that Dr. Saghafi's findings do not conclude that Plaintiff cannot perform work.  Dr. Saghafi noted that the "[Plaintiff] *states* that [neuropathy] prevents him from having either a physically exertional or sedentary job due to continuous pain and the need to constantly move about." (Docket No. 12, pp. 442 of 508)(emphasis added).  Dr. Saghafi's findings noted that Plaintiff "has the educational background and capacity to work *in at least* a part-time position in light duty types of work . . ." (Docket No. 12, pp. 442 of 508)(emphasis added).

### c.    DR. SHAPIRO

Plaintiff alleges that ALJ Loucas essentially rejected the opinion of Dr. Shapiro, a treating physician, and ignored her findings concerning Plaintiff's foot muscle atrophy, slowed gait, difficulty with heel and toe walking, the presence of tremors in his hand, poor tandem gait, and the results of his EMG test (Docket No. 15, pp. 16 of 19; Docket No. 18, pp. 4 of 11).  Defendant disagrees and argues that Dr. Shapiro's opinions were only partially discounted, and otherwise credited in ALJ Loucas' decision (Docket No. 17, pp. 13 of 16).

Dr. Shapiro's treatment records and opinions are cited throughout ALJ Loucas' decision including

the findings that Plaintiff alleges ALJ Loucas ignored.  During her analysis of the Plaintiff's physical limitations, ALJ Loucas referenced the results from Plaintiff's EMG test, which she wrote, "revealed the presence of moderately severe, generalized, and active peripheral polyneuropathy" (Docket No. 12, pp. 24 of 508).  ALJ Loucas also detailed Dr. Shapiro's findings from her examination of Plaintiff in February 2010, noting her findings that Plaintiff has slight atrophy of the foot muscles, postural tremors in both his hands, and slowed gait (Docket No. 12, pp. 24 of 508).  In her discussion of the weight she attributed to the opinion evidence, ALJ Loucas credited Dr. Shapiro's findings in determining to afford greater weight to Plaintiff's subjective neuropathy complaints over the opinions of the State Agency medical consultants, noting the results of Plaintiff's EMG testing and neuropathy treatment records are consistent with Plaintiff's persistent complaints of pain, tingling, numbness, and weakness in his extremities (Docket No. 12, pp. 25 of 508).  While ALJ Loucas clearly did not ignore or reject Dr. Shapiro's findings, she did indicate that she afforded Dr. Shapiro's opinions concerning Plaintiff's physical RFC, less weight in her analysis (Docket No 12, pp. 26 of 508).  Since ALJ Loucas partially discounted Dr. Shapiro's findings she did not afford Dr. Shapiro's opinions controlling weight.

Controlling weight is afforded to a treating physician so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. 404.1527(c)(2), 416.927(c)(2) (West 2014); *Warner v. Comm'r of Soc. Sec*., 375 F.3d 387, 390 (6th Cir. 2004).  In this case, ALJ Loucas appropriately discounted Dr. Shapiro's opinions concerning Plaintiff's RFC because there is substantial contrary evidence in the record concerning Plaintiff's physical limitations.  In her analysis of Dr. Shapiro's physical RFC findings, ALJ Loucas noted that Dr. Shapiro's findings are inconsistent with the credible evidence of the record, referencing Dr. Saghafi's physical examination of Plaintiff in July 2011 (Docket No. 12, pp. 26 of 508).  Dr. Saghafi's examination notes reflect that Plaintiff had normal strength and range of motion, whereas

Dr. Shapiro's physical assessment from February and May 2012, opined that Plaintiff is too weak to carry items, stand, walk or perform any postural activities, and he has extensive environmental and manipulative limitations, which would hinder him during a typical work day (Docket No. 12, pp. 441; 444-446; 477-478; 503-504 of 508).

When compared to the other physical assessments in the case record, Dr. Shapiro's physical RFC findings for Plaintiff are the most extreme.  Dr. Holbrook, Dr. Subauste, and Dr. Saghafi, all assessed a greater level of physical functionality than opined by Dr. Shapiro (Docket No. 12, pp. 346-353; 483-484; 440-442 of 508).  For example, Dr. Holbrook and Dr. Saghafi noted that Plaintiff is capable of carrying, lifting, standing, walking and performing some postural activities (Docket No. 12, pp. 347-350; 442 of 508).  Dr. Subauste opined that Plaintiff can lift and carry up to six pounds, is impaired in his ability to stand and walk to some degree, has no manipulative limitations, and is capable of some the postural activities[15](Docket No. 12, pp. 483-484 of 508).  Dr. Shapiro's stated limitations are also inconsistent with her own treatment records, which recount Plaintiff's neuropathy symptoms, her treatment of Plaintiff's neuropathy with varying doses of Neurontin, and an EMG test result, but otherwise fails to provide medical evidence which would support the physical limitations Dr. Shapiro alleges (Docket No. 12, pp. 342-345; 494-499 of 508).

Additionally, ALJ Loucas reasoned that Dr. Shapiro's physical RFC findings assessed a greater degree of physical limitation than the Plaintiff alleges.  The ALJ noted that some degree of postural functioning is required to stand up from a seated position and that Plaintiff had already shown a greater degree of functioning than assessed by Dr. Shapiro by his ability to live alone.  ALJ Loucas' statement concerning the functioning required to stand up is an apparent reference Dr. Shapiro's findings from

---

[15]    Dr. Subauste notes that Plaintiff's impairments affect his ability to stand and walk, however; he provided no quantitative limitations for standing or walking during a typical work day.

functional testing in February 2010, in which Dr. Shapiro noted "the patient can arise from a chair with no difficulty" (Docket No. 12, pp. 344 of 508).

Plaintiff argues that the ability to perform simple functions of daily living cannot constitute a valid basis for rejecting a treating source's opinion. (Docket No 15, pp. 15 of 19).   In support of his contention, Plaintiff cites *Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967), which recognized that the "fact that [a claimant] can still perform simple functions, such as driving, grocery shopping, dish washing, and floor sweeping, does not necessarily indicate that this [claimant] possesses an ability to engage in *substantial gainful activity*." *Gardner*, 381 F.2d at 586 (emphasis added).  Plaintiff correctly summarizes *Walston*, but inappropriately applies it to the facts of this case.  ALJ Loucas' references to Plaintiff's ability to live alone are in the context of making a credibility determination concerning Dr. Shapiro's and Dr. Subauste's opinions, not Plaintiff's ability to engage in SGA.

The record and ALJ Loucas' decision reflect consideration of the requisite factors enumerated in 20 C.F.R. § 404.1527 and § 416.927, for discounting and affording Dr. Shapiro's RFC findings less weight in her analysis.  In her decision, ALJ Loucas refers to Dr. Shapiro as a "treating source," notes her specialization as a psychologist and neurologist, summarizes Dr. Shapiro's treatment of Plaintiff, and specifically points to the evidence she determined to be inconsistent with Dr. Shapiro's RFC findings (Docket No. 12, pp. 24; 26 of 508). The record also indicates that ALJ Loucas credited Dr. Shapiro's findings that were supported by the rest of the record concerning Plaintiff's neuropathy and Plaintiff's subjective complaints (Docket No. 12, pp. 25 of 508).

### d.    DR. SUBAUSTE

In her decision, ALJ Loucas references Dr. Subauste as a treating physician and notes giving his opinion less weight in her analysis (Docket No. 12, pp. 26 of 508).  ALJ Loucas reasoned that Dr. Subauste's assessment of Plaintiff's physical RFC is inconsistent with Dr. Saghafi's findings that Plaintiff

30

had full strength and range of motion in July 2011, the functioning required to live alone  and evidence that Plaintiff's HIV is stable in response to treatment (Docket No. 12, pp. 26 of 508).

Plaintiff alleges that ALJ Loucas (1) failed to weigh the requisite factors for discounting Dr. Subauste's opinion; (2) substituted Dr. Subauste's opinion with her own and; (3) relied upon her own interpretation of Dr. Subauste's treatment notes to reject his treating assessment of Plaintiff's functional limitations (Docket No. 15, pp. 13-14 of 19; Docket No. 18, pp. 4 of 11).  Plaintiff also contends that Dr. Subauste's findings concerning Plaintiff's physical health are consistent with those of Plaintiff's other treating physicians that Plaintiff cannot perform full time sedentary work (Docket No. 18, pp. 7 of 11). Defendant disagrees with Plaintiff's assertions, and maintains that ALJ Loucas appropriately weighed and assessed Dr. Subauste's opinions because they are inconsistent with the credible evidence (Docket No. 17, pp. 13 of 16).

ALJ Loucas did not err in determining not to afford Dr. Subauste's opinion controlling weight because his opinions are not well-supported by medically acceptable clinical or laboratory diagnostic techniques and are inconsistent with the substantial evidence in the case record.  The case record contains substantial contrary evidence, including clinical and laboratory diagnostic test results which reflect that Plaintiff's HIV had stabilized with treatment and that he is of good physical strength.  Dr. Bass' treatment records for examinations in March 2008 and September 2009, noted Plaintiff's HIV was in good control and that he was stable.  The results of Plaintiff's HIV viral load testing in both February and March 2010, reported that Plaintiff's viral count was too low to be detected[16] (Docket No. 12, pp. 370; 384 of 508). Dr. Subauste's treatment records from his examinations note Plaintiff's neuropathy, but also document

---

[16]

"The goal of HIV treatment is to help move your viral load down to undetectable levels. In general, your viral load will be declared "undetectable" if it is under 40-75 copies in a sample of your blood (the exact number depends on the lab performing the test)."    Viral Load, U.S. Dept. of Health & Human Srvs., (Apr. 18, 2014, 12:38 PM), http://aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/viral-load/.

Plaintiff's pain level at 0 (Docket No. 12, pp. 415-417 of 508).

ALJ Loucas' decision and the record reflects her consideration of the requisite factors for determining the appropriate weight to afford Dr. Subauste's physical RFC findings. For instance, ALJ Loucas' decision refers to Dr. Subauste as a "treating physician," which by its definition required her to consider the length, frequency, nature, and extent of the treatment relationship (Docket No. 12, pp. 26 of 508); 20 C.F.R. § 404.1502 (West 2014). In her assessment of the credibility that she afforded Dr. Subauste's findings, ALJ Loucas noted Dr. Subauste's opinions are inconsistent with Plaintiff's functional capabilities such as living alone, Dr. Saghafi's physical findings, and medical source descriptions of Plaintiff's physical stability with HIV treatment (Docket No. 12, pp. 26 of 508).

Plaintiff alleges that Dr. Subauste's findings concerning Plaintiff's physical health is consistent with those of Plaintiff's other treating physicians that Plaintiff cannot perform full-time work (Docket No. 18, pp. 7 of 11). In support, Plaintiff cites Dr. Subauste's physical RFC assessment of Plaintiff, but Dr. Subauste makes no such conclusion anywhere on the form (Docket No. 12, pp.483-484 of 508). Instead, Dr. Subauste assessment reflects that Plaintiff is at least able to lift and carry up to six pounds, capable of occasional postural activities, and has no manipulative limitations (Docket No. 12, pp. 483-484 of 508). Plaintiff also alleges that ALJ Loucas relied upon her own interpretation of Dr. Subauste's treatment notes in making her determination, but Plaintiff fails to provide any specific example of such an interpretations (Docket No. 15, pp. 13 of 19).

### e. DR. PARRISBALOGUN AND MS. RAVEN

Plaintiff also contests ALJ Loucas' assessment of the opinions of his mental health sources. Plaintiff first alleges that ALJ Loucas did not appropriately articulate her reasons for discounting Dr. Parrisbalogun's opinion, which he argues is that of a "treating physician" (Docket No. 15, pp. 12; 14; 16 of 19; Docket No. 18, pp. 5-7 of 11). In discounting Dr. Parrisbalogun's opinion, Plaintiff contends that

ALJ Loucas replaced Dr. Parrisbalogun's opinion with her own interpretation of Dr. Parrisbalogun's treatment notes (Docket No. 15, pp. 13-14 of 19). Plaintiff argues that his ability to live alone is inconsistent with the limitations assessed by Dr. Parrisbalogun and his therapist Ms. Karen Raven (Docket No. 15, pp. 14-15 of 19). Defendant disagrees and contends that ALJ Loucas appropriately afforded Dr. Parrisbalogun's opinion less weight because his "extensive conclusions" are inconsistent with the record (Docket No. 17, pp. 14 of 16).

The record reflects that ALJ Loucas did not err in determining that Dr. Parrisbalogun is not a treating physician and affording the opinion less weight in her analysis. The only references to Dr. Parrisbalogun in the record consist of Dr. Parrisbalogun's medical source statement completed in February 2012, and Ms. Raven's notation in her treatment summary that Plaintiff was referred to her by Dr. Parrisbalogun for counseling in January 2012 (Docket No. 12, pp. 480-481; 508 of 508). The Sixth Circuit has held that more than one examination is required for a medical source to qualify as a treating physician and "depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship." *Pethers v.Comm'r of Soc. Sec.*, 580 F.Supp.2d 572, 579, n.16 (W.D. Mich. 2008)(citing *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 506 (6th Cir. 2006)). Both the record and law support ALJ Loucas' determination not to afford Dr. Parrisbalogun's opinion the same weight as a treating physician.

ALJ Loucas decision reflects her consideration of the requisite factors in determining the weight to afford Dr. Parrisbalogun's opinion. She summarized Dr. Parrisbalogun's limited treatment relationship, his mental RFC assessment, and determined that his extensive conclusions are unsupported by and inconsistent with the record (Docket No. 12, pp. 27-28 of 508). ALJ Loucas noted that Plaintiff reported to Dr. House in April 2011, that he was not under the care of any mental health professional and had not taken medication previously prescribed for depression (Docket No. 12, pp. 27; 427 of 508).

33

Further, ALJ Loucas emphasized that when Plaintiff was referred to counseling in January 2012, his attendance at counseling sessions was inconsistent, and that Plaintiff's lack of consistent psychological treatment prevented his treating sources from determining whether his subjective complaints are responsive to treatment (Docket No. 12, pp. 27-28 of 508).

In his Reply Brief, Plaintiff asserts that the ALJ improperly discounted Dr. Parrisbalogun and Ms. Raven's opinions on the basis that he had inconsistently attended treatment and not taken his prescribed medication (Docket No. 18, pp. 5 of 11).  In support, Plaintiff cites *Groneman v. Barnhart*, 2007 WL 781750, *12 (N.D. Ill. 2007), which recognized the rule set forth in SSR 96-7P, precluding an adjudicator from drawing any inferences about an individual's statements concerning their symptoms and their functional effects from a failure to seek or pursue regular medical treatment without having first considered any explanations the individual may provide or other information in the case record that may justify the infrequent, irregular, or failure to seek medical treatment.  *See* SSR 96-7P, 1996 WL 374186 *7 (July 2, 1996).  The undersigned notes that ALJ Loucas' reference to the inconsistency of Plaintiff's psychological treatment is within the context of her evaluations of both Dr. Parrisbalogun and Ms. Raven's opined limitations which ALJ Loucas concluded were neither supported by nor consistent with the objective record (Docket No. 12, pp. 28 of 508).  Therefore, ALJ Loucas did not improperly consider the inconsistency of Plaintiff's treatment since she did not use it to assess the credibility of Plaintiff's statements concerning his symptoms or their functional effects.

Plaintiff alleges that Ms. Raven's opinions as his treating counselor were not appropriately considered and that those opinions support a finding that Plaintiff is disabled (Docket No. 15, pp. 14 of 19; Docket No. 18, pp. 7 of 11).  ALJ Loucas's decision clearly reflects that she considered Ms. Raven's opinion.  ALJ Loucas referenced Ms. Raven's treatment notes in her analysis of the evidence concerning Plaintiff's mental limitations (Docket No. 12, pp. 24 of 508).  ALJ Loucas also devoted a paragraph of

34

analysis concerning Ms. Raven's opinion.  In that analysis, ALJ Loucas noted that Ms. Raven is "not an acceptable medical source," which reflects her consideration of Ms. Raven's opinion under the SSA's rules and regulations (Docket No. 12, pp. 28 of 508).

In addition to medically acceptable sources, the SSA rules establish another category of source referred to as "other source" opinions, which are to be considered in evaluating a claimant's disability claim. *See* SSR 06-03p (August 9, 2006).  The weight attributed to such opinions is weighed against the basic principles set forth in 20 C.F.R. § 404.1527(d) and § 416.927(d). *Id.*  The SSA guidelines note that not every factor will apply in every case and that the evaluation of such opinions will depend upon the facts and evidence of the particular case. *Id.*  While an ALJ must consider the other source opinions in evaluating a disability claim, such other-source opinions are not entitled to any special deference. *See Hill v. Comm'r of Soc. Sec.*, 2014 WL 1257948 (6th Cir. 2014)(not reported)(citing SSR 06-03p).

ALJ Loucas' decision reflects her consideration of the basic principles set forth in 20 C.F.R. § 404.1527 and § 416.927(d) in her analysis of the weight to attribute to Ms. Raven's opinion.  ALJ Loucas noted Ms. Raven's inconsistent treatment of Plaintiff limited her ability to render an opinion concerning the effects of treatment and that her opinion was otherwise inconsistent and unsupported by the record (Docket No. 12, pp. 28 of 508).

### f.     DR. HOUSE

The SSA regulations provide that the rules for considering medical and other opinions of treating sources and other sources also apply when the SSA considers the medical opinions of non-examining sources, including state agency medical and psychological consultants and other program medical sources. 20 C.F.R. § 404.1527(e) (West 2014).  While there are progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker, opinions of medical sources who do not have a treatment relationship with a claimant are weighed by

stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources. SSR 96-6p, 1996 WL 374180 (July 2, 1996).  For this reason, the opinions of state agency medical and psychological consultants and other program medical sources can be given weight if they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence, including any evidence received at the ALJ and Appeals Council levels that was not before the state agency, the consistency of the opinion provided by the state agency medical or psychological consultant or other program medical source. *Id.*

Since State agency medical and psychological consultants are highly qualified psychologists who are also experts in Social Security disability evaluations, an ALJ must consider findings of State agency psychological consultants as opinion evidence. *Id.*  While ALJs are not bound by the findings made by State agency psychologists, they may not ignore their opinions and they must explain the weight given to the opinions in their decision.  *Id.*

Plaintiff generally alleges that ALJ Loucas did not articulate valid reasons for discounting the opinion of Dr. House, and offers nothing in support of the allegation (Docket No. 15, pp. 12; 16 of 19). In his reply brief, Plaintiff argues that Dr. House's opinion is consistent with those of Dr. Parrisbalogun and Ms. Raven that Plaintiff has serious mental health limitations which would impair his ability for full time employment (Docket No. 18, pp. 7 of 11).

ALJ Loucas' decision reflects that she did in fact articulate a valid basis for discounting Dr. House's nonexamining opinion.  ALJ Loucas' decision contains her analysis of Dr. House's opinions noting that they were inconsistent with the record and affording them less weight in her analysis.  She highlighted Dr. House's findings that Plaintiff was compulsive, deteriorating or decompensating, had interrupted attention and concentration, deficit memory, and was confused as contrasted with Dr. Saghafi's findings three months later, which described Plaintiff as alert, oriented, articulate in manner,

36

and able to comprehend and understand his environment and peers (Docket No. 12, pp. 27 of 508). ALJ Loucas concluded that Dr. House's opinions were unsupported by the record as a whole and that she afforded them less weight in her decision (Docket No. 12, pp. 27 of 508).  Therefore, it is clear that ALJ Loucas considered and properly articulated her reasons for discounting Dr. House's opinions.

## VII. CONCLUSION

For the foregoing reasons, the undersigned recommends that this Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate Judge.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date: May 21, 2014

## VIII.  NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.